OPINION OF THE COURT
Richard Rivera, J.
In this negligence action, plaintiff is the niece of the decedent *660 as well as the administratrix of Ms. Garcia’s estate. Plaintiff claims that while Ms. Garcia was a patient of the defendant hospital in December 1998, the hospital failed to follow its internal Fall/Injury Prevention Protocol (the protocol) which required it to keep all the bed rails on the decedent’s hospital bed in the raised position at all times, and that plaintiff fell while one of the bed rails was in its lowered position. She seeks damages on behalf of the estate for the decedent’s personal injuries.
The trial of this action was commenced on May 22, 2002. After plaintiff rested her case, defendant moved to dismiss the action on the ground that plaintiff had failed to establish that defendant had acted negligently, and that even if, arguendo, she had established defendant’s negligence, she had nevertheless failed to establish that this negligence was a proximate cause of decedent’s injuries. The relevant facts are as follows.
Relevant Facts
On December 1, 1998, Ms. Garcia was taken to defendant’s emergency room with respiratory problems and related complications. She was 86 years old at the time, had been suffering from Alzheimer’s disease for approximately one year, and neither spoke nor understood English. Ms. Garcia lived alone in an apartment building where plaintiff also lived. Plaintiff’s mother was one of Ms. Garcia’s three sisters, but the other two sisters were out of touch with the decedent up to the time of her death. It appears that by December 1, 1998, plaintiff and her mother were the only family members who were in close touch with Ms. Garcia.
Describing decedent’s condition during the year before December 1, 1998, plaintiff testified that Ms. Garcia could not care for her own needs after she was stricken with Alzheimer’s disease. Ms. Garcia could not walk, go to the bathroom, or feed herself without assistance, and she relied upon plaintiff’s help as well as the assistance of an eight-hour-a-day home attendant to care for all her physical needs. Plaintiff also testified that Ms. Garcia would get lost if she left her apartment alone, but that she often insisted on going out by herself and became belligerent when plaintiff or the home attendant prevented her from leaving her apartment. Ms. Garcia once threatened plaintiff with a knife when she would not allow her to leave her apartment unescorted. On November 29, 1998, Ms. Garcia became markedly weaker with labored breathing, and her condition had deteriorated by December 1, 1998.
*661 During Ms. Garcia’s admission, the hospital’s emergency room record noted that Ms. Garcia suffered from Alzheimer’s disease, and Ms. Garcia was classified as a high risk for falling based upon criteria contained in the hospital’s internal evaluation system. Accordingly, plaintiff was covered by the hospital’s Fall/Injury Prevention Protocol which applied to patients who posed a high risk for falling.
In relevant part, the protocol required daily reassessment for continued fall potential throughout the patient’s hospitalization, and these reassessments were to be recorded in the hospital’s “Assessment/Re-Assessment Record.” The protocol also required hospital personnel to assess the physical and mental condition of high risk patients, and any medications that, among other things, could suppress the patient’s thought process. Moreover, for patients covered by the protocol, hospital beds were to be kept “in low position with siderails up at all times,” a “safety alert” sign was to be posted above their beds, and hospital personnel were required to “observe” high risk patients every two hours.
Plaintiff testified that Ms. Garcia was always in bed when she visited her, and that the hospital bed had separate lower and upper bed rails on each side. During each of her daily visits, she noticed that both left side bed rails were in the raised position, but that the lower right side bed rail was always down.
The nurse assigned to Ms. Garcia on December 2 and 3, 1998 was Martha Sewell, and her shift was from 3:00 p.m. to 11:00 p.m. The nurse progress notes noted that Ms. Garcia was alert but confused and incontinent for urine at 10:00 a.m. on December 2, 1998, and that by 2:00 p.m., she remained confused but responsive to verbal stimuli. Her December 2, 1998 notes record that at 4:00 p.m. “all rails up and locked.” At 1:00 a.m. on December 3, 1998, the night nurse who took over for Nurse Sewell wrote in the progress notes that “rails up.” The doctor’s notes indicate that on December 3, 1998 at 2:00 p.m., Ms. Garcia refused treatment, and by 5:30 p.m. later that day, Nurse Sewell’s progress notes indicate that Ms. Garcia remained confused, tried to bite and kick her, and raised her hand to refuse food. These notes also indicate that she assisted Ms. Garcia to and from the bathroom, and that “the patient was left with side rails up and bed in low position.”
At 7:50 p.m. on December 3, 1998, Nurse Sewell found Ms. Garcia lying face down on the hallway floor just outside of her hospital room. After checking Ms. Garcia’s physical condition, *662 Nurse Sewell and other nurses assisted Ms. Garcia to her bed, and Nurse Sewell then notified the doctor assigned to Ms. Garcia, Dr. Singh. At trial, she testified that the bed rails were in the lowered position when she entered the room to put Ms. Garcia back in her bed.
As required by hospital procedures, Nurse Sewell prepared an incident report where she wrote that she had found Ms. Garcia on the hallway floor. Nevertheless, Dr. Singh later reported that a nurse had informed him that Ms. Garcia had fallen from her bed. In subsequent reports, two other doctors also reported that Ms. Garcia had fallen from her bed.
At trial, Nurse Sewell denied telling the doctors that Ms. Garcia had fallen from her bed; however, she confirmed plaintiffs testimony that one of the bottom bed rails was always kept in the lowered position. In this regard, she explained that the hospital was required to keep one of the bed rails in the lowered position because to do otherwise would be considered an unauthorized restraint violative of the Patients’ Bill of Rights (10 NYCRR 405.7), and only a doctor could order such restraint. In addition, the protocol required the hospital to post a “safety alert” sign above these patients’ beds, but Nurse Sewell testified that she could not recall whether such sign was placed above Ms. Garcia’s bed.
During her testimony, Nurse Sewell also stated that the Assessment/Re-Assessment Record documents that the nurse’s aide she supervised checked on Ms. Garcia once every hour as evidenced by the aide’s initials in the appropriate time boxes. This exceeded the once every two hour checks required by the protocol. Nevertheless, the same record does not contain anyone’s initials for the checkup due on December 3, 1998 at 5:00 p.m. In addition, the aide’s initials for 7:00 p.m. on December 3, 1998 (50 minutes before Nurse Sewell found Ms. Garcia on the floor), are not clearly placed inside the 7:00 p.m. box; rather the initials are written on the line between the 7:00 p.m. and 8:00 p.m. boxes.
Regarding restraints, plaintiff testified that she saw Ms. Garcia’s hands tied to her hospital bed when she visited her before her accident, and that she would see Ms. Garcia try to untie herself using her teeth. Sometimes she succeeded. The hospital denies that it ever physically restrained Ms. Garcia, and Nurse Sewell testified that such restraints could only be implemented on doctor’s orders. The hospital records do not contain a doctor’s order directing such physical restraints for Ms. Garcia.
*663 Based on these facts, plaintiff claims that the hospital violated its own protocol for high risk patients by not keeping all the bed rails on Ms. Garcia’s bed raised. She contends that this violation constitutes negligence and was a proximate cause of Ms. Garcia’s fall.
The hospital claims that plaintiff has failed to establish a prima facie case of negligence against it and moves to dismiss the action. It contends that the hospital followed its protocol in all respects. While the protocol required that hospital personnel check Ms. Garcia only once every two hours, its medical providers checked her on an hourly basis. And, while it acknowledges that its personnel left one of the four bed rails in the “down” position at all times, it nevertheless contends that this is required by New York State Health Regulation (10 NYCRR 405.7) which provides that hospitals may not physically restrain patients without a doctor’s order. Arguing that leaving all the rails in the raised position would constitute a restraint, the absence of a doctor’s order in this regard required that the hospital leave one rail down even if this did not strictly comply with the hospital’s protocol. In any event, the hospital argues that there is no version of the credible evidence upon which a jury could conclude that the proximate cause of Ms. Garcia’s fall was the one lowered bed rail. Accordingly, it urges that since plaintiff can neither establish that the hospital violated its own protocol nor that such violation, even if established, was the proximate cause of Ms. Garcia’s fall, she cannot establish negligence against the hospital as a matter of law.
Discussion
Preliminarily, on a motion to dismiss a plaintiffs negligence action at the close of the plaintiffs case, courts must view the evidence in the light most favorable to the plaintiff. (Schneider v Kings Highway Hosp. Ctr., 67 NY2d 743, 745; Secof v Greens Condominium, 158 AD2d 591, 593 [2d Dept 1990].) The motion “should only be granted if there is no rational process by which a jury could find for the plaintiff as against the moving defendant.” (Secof v Greens Condominium, id. at 593.)
To establish a prima facie case of negligence based on circumstantial evidence, “ [i]t is enough that [plaintiff! shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred.” (Schneider v Kings Highway Hosp. Ctr., id. at 744.) The law does not require that plaintiffs proof *664 “positively exclude every other possible cause” of the accident but defendant’s negligence. (Id.) Rather, plaintiffs proof “must render those other causes sufficiently ‘remote’ or ‘technical’ to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence.” (Id.; Dillon v Rockaway Beach Hosp. & Dispensary, 284 NY 176, 179 [1940].) The test is whether the plaintiffs claims are supported by “the logic of common experience itself, as applied to the circumstances shown by the evidence, led to the conclusion that defendant’s negligence was the cause of plaintiffs injury.” (Schneider v Kings Highway Hosp. Ctr., id. at 745.) Where a case presents several competing factual claims, it is for the jury to determine which version is more credible. As long as the version selected would rationally justify a particular verdict, then our courts will not disturb the verdict. (Id. at 745.)
Furthermore, the general rule is that a hospital is not liable in negligence for the failure to erect bed rails absent a doctor’s medical order. (Haber v Cross County Hosp., 37 NY2d 888 [1975].) However, this rule “does not apply where the hospital establishes a rule that bed rails- were to be set up in all cases” for a particular class of patients. (Haber v Cross County Hosp., at 889; Kadyszewski v Ellis Hosp. Assn., 192 AD2d 765 [3d Dept 1993].) A hospital’s failure to abide by its policy of requiring raised bed rails is some evidence of negligence absent a contrary medical order, and a determination as to whether the hospital was negligent will depend on the proofs presented at trial. (Tober v Mount Sinai Hosp., 149 AD2d 692, 693 [2d Dept 1989].)
In this case, it is undisputed that defendant’s Fall/Injury Prevention Protocol was in place when Ms. Garcia fell on December 3, 1998, and that it covered her. That protocol unambiguously directed that the side rails be kept in the raised position for high risk patients like Ms. Garcia, and it does not create any exceptions based upon 10 NYCRR 405.7. The proof at trial further establishes that there were no doctors’ orders overriding the protocol in this regard with respect to Ms. Garcia. Yet, Nurse Sewell testified that the hospital always kept one of the bed rails in the lowered position, and that she saw the bed rails “down” immediately after discovering Ms. Garcia in the hallway. This was a clear violation of the protocol. This departure from the protocol is some evidence of negligence. (Haber v Cross County Hosp., id.; Kadyszewski v Ellis Hosp. Assn., id.; Tober v Mount Sinai Hosp., id.) Although defendant *665 appears to contend that 10 NYCRR 405.7 should be read to modify the protocol as a matter of law, it does not cite cases supporting this contention and the court has not found any; rather, case law continues to affirm the well settled principle that a violation of a hospital’s own policies regarding bed rails is some evidence of negligence absent a contrary medical directive in a particular case. (Staveley v St. Charles Hosp., 173 FRD 49 [ED NY 1997]; Kadyszewski v Ellis Hosp. Assn., id.)
Regarding causation, the facts adduced at trial could allow a jury to logically conclude that defendant’s violation of its own protocol was a proximate cause of Ms. Garcia’s fall and injuries. Nurse Sewell’s testimony that she found the bed rails in the lowered position when she returned Ms. Garcia to her bed after the accident could support the finding that a hospital employee lowered them. (Schneider v Kings Highway Hosp. Ctr., supra.) This would be a rational determination were the jury to believe that Ms. Garcia did not lower the bed rails herself because she was too weak to have done so given the fact that she needed assistance to go to the bathroom a little less than two and a half hours before her accident.
The trial record also presents issues of credibility that could support a jury’s finding of negligence and causation. In this regard, three doctors wrote medical entries in Ms. Garcia’s medical file indicating that they were informed that Ms. Garcia had fallen from her bed. This disputes Nurse Sewell’s testimony. Indeed, since she was Ms. Garcia’s assigned nurse, the jury could conclude that Nurse Sewell was the source of these doctors’ information. Furthermore, the Assessment/ReAssessment Record leaves open the possibility that, no one checked on Ms. Garcia at 5:00 p.m. and at either 7:00 p.m. or 8:00 p.m. on December 3, 1998. In this regard, since the initials of the nurse’s aide for the 7:00 p.m. or 8:00 p.m. visit were placed on the line between the boxes for 7:00 p.m. and 8:00 p.m., a jury could reasonably conclude that the aide did not check Ms. Garcia at 7:00 p.m. as Nurse Sewell testified but, rather, checked her at 8:00 p.m. after the accident. If the jury believes that the hospital did not check Ms. Garcia at 7:00 p.m. (just 50 minutes before the accident), it could conclude that this contradicts Nurse Sewell’s testimony that defendant’s nursing staff checked Ms. Garcia every hour, and that the hospital staff responsible for checking Ms. Garcia did not do so. It is for the jury to evaluate the parties’ competing contentions regarding the ambiguity of the aide’s placement of his/her initials in the light of the record as a whole and the credibility *666 of the witnesses. This is especially true since the nurse’s aide who initialed the Assessment/Re-Assessment Record did not testify.
Furthermore, the nurse’s progress notes for December 2, 1998 indicating that all rails were up and locked contradict Nurse Sewell’s testimony that one rail always had to be kept lowered because of 10 NYCRR 405.7 (b) (5). In this connection, Nurse Sewell testified that all the rails could be kept upright only with a doctor’s order. It is conceded that no such order existed. Moreover, in this regard, the jury could conclude that it was possible that the safety alert sign was not placed above Ms. Garcia’s bed and this could support a jury’s conclusion that the hospital was lax in implementing its safety protocol.
Conclusion
For the foregoing reasons, defendant’s motion to dismiss this action on the ground that plaintiff has failed to set forth a prima facie case is denied.